664 A.2d 27

**Angela Cecilia SIMMONS, et al.**

v.

**Joann URQUHART, et al.**

**No. 1314, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Aug. 30, 1995.

Robert G. Samet (Jonathan S. Beiser and Ashcraft & Gerel, on the brief), Rockville, for appellants.

H. Kenneth Armstrong (Maura J. Condon and Armstrong, Donohue & Ceppos Chartered, on the brief), Rockville, for appellees.

Argued before WILNER, C.J., and DAVIS and HARRELL, JJ.

HARRELL, Judge.

In our prior opinion in this matter, *Simmons v. Urquhart*, 101 Md.App. 85, 643 A.2d 487 (1994), we reversed the judgment of the Circuit Court for Montgomery County based on our disposition of appellant's first issue regarding venue/*forum non conveniens*. Although we did not decide appellants' second issue—the failure of the trial judge to give a requested jury instruction regarding the doctrine of last clear chance—, we did discuss it for the benefit of the trial court in the event of a new trial.

A majority of the Court of Appeals, on certiorari, reversed our judgment as to the venue/*forum non conveniens* issue. *Urquhart v. Simmons*, 339 Md. 1, 660 A.2d 412 (1995). The majority opinion held that "a trial court may not *sua sponte* transfer a case on the grounds of *forum non conveniens.* In this case, however, because there was a motion to transfer filed by the defendants, that issue was not initially raised by the trial judge. We also hold that the trial court did not abuse its discretion in transferring this action to Montgomery County." At 21, 660 A.2d 412. In addition, the Court, in remanding the case to us, stated that "[w]hether the failure to give a last clear chance instruction necessitates a new trial is an issue that should be addressed by the Court of Special Appeals." At 21, 660 A.2d 412. We shall do so.

## *ISSUE*

The sole issue remaining for our consideration is whether the trial court committed reversible error by failing to give the "last clear chance" jury instruction requested by appellants, Angela C. Simmons, and her children, Sharon, David, and Mark.

## *FACTS*

We shall reiterate only those facts that are pertinent to the remaining issue. The following facts are undisputed.

This appeal arises out of a tort action filed by Angela Simmons, and her children, Sharon, David, and Mark Simmons, in the Circuit Court for Prince George's County [1] against Joann Urquhart, M.D., William Tullner, M.D.,[2] and Maryland Cardiology Associates, P.A. (MCA) for wrongful death and survival arising out of the death of Anthony Simmons, the husband and father of the plaintiffs.

---

1. The case was transferred to the Circuit Court for Montgomery County for trial.

2. Dr. Tullner was dismissed from this case prior to trial.

Mr. Simmons, a volunteer fireman and former ambulance driver, visited MCA's Laurel office on 25 February 1987 complaining of chest pains. On 4 March 1987, at the request of Dr. Tullner, Simmons was admitted to the Washington Adventist Hospital in Montgomery County. On the following day, Dr. Tullner performed a cardiac catheterization on Mr. Simmons to determine the existence or extent of any arterial blockage. The procedure entails inserting a catheter, or thin tube, into the groin area, and advancing it through the body until it reaches the coronary arterial region. Dye is then injected into the arteries through the catheter and x-rays are taken of the coronary area. The dye outlines the interior of the arteries so that blockages occurring are detectable on the x-rays. The x-rays of Mr. Simmons's arterial passages demonstrated no significant blockage.

Following his performance of Mr. Simmons's catheterization, Dr. Tullner left the area to attend a medical convention. Dr. Tariq Mahmood, the third physician associated with MCA, also attended the convention. The only MCA cardiologist remaining on duty in the vicinity was Dr. Urquhart, who, at the time of Mr. Simmons's hospitalization, was approximately eight and one-half months pregnant.

Prior to discharging Simmons on 9 March 1987, Dr. Urquhart checked his hospital chart, evaluated his blood pressure, examined his heart and lungs, and gave Simmons routine discharge instructions and medications. Dr. Urquhart told Simmons to call her if he experienced any problems. She did not warn him specifically about post-catheterization symptoms, such as pain and fever, commonly associated with a potentially deadly condition known as pulmonary embolization. Pulmonary embolization occurs when a blood clot forms in the leg near the catheterization site and then breaks loose and travels to the lung. On 13 March, seven days after the catheterization, Mr. Simmons died at Greater Laurel Beltsville Hospital in Prince George's County. An autopsy determined the cause of death to be from a pulmonary embolism.

At the jury trial conducted in the Circuit Court for Montgomery County, the parties vigorously disputed the number and substance of the communications between Dr. Urquhart, the MCA office in Bethesda, and the decedent following his hospital discharge. Appellants argued that Dr. Urquhart negligently failed to respond to Mr. Simmons's messages indicating his severe physical condition and negligently failed to diagnose his ailment when she finally did contact him. Appellees defended by arguing that Mr. Simmons's repeated refusals to seek immediate medical attention amounted to contributory negligence. The parties' respective versions of these facts relevant to this appeal follow.

## Appellants' Case

According to the testimony of both Mrs. Simmons and Ms. Sharon Siegler, the MCA Bethesda office manager, Mr. Simmons repeatedly called the MCA Bethesda office in attempts to reach Dr. Urquhart.[3] Despite testimony from Siegler that Mr. Simmons's messages were given to Dr. Urquhart as recorded, Dr. Urquhart never returned his calls.

Mr. Simmons called his diabetes physician, Wayman W. Cheetham, M.D., because he was concerned about the symptoms he was experiencing following the catheterization and distressed over his inability to reach his cardiologist. Dr. Cheetham told Mr. Simmons that "it was very important for him to try to contact his physician directly. And given the circumstances that he was describing, if he was unable to do so, that he had to make arrangements to be seen by someone." Dr. Cheetham instructed Mr. Simmons that if he could not

---

**3.** In support of this fact, appellants entered into evidence notes taken by Siegler during three telephone conversations between herself and Mr. Simmons following his hospital discharge. On 10 March 1987, Ms. Siegler's notations suggested Mr. Simmons was experiencing pain in the left side of his stomach and a fever of approximately 102 degrees. On 11 March 1987, the note stated "hematoma from cath.," "fever," and "pain." The 12 March 1987 notes indicated Mr. Simmons was experiencing "sharp pain down above where the cath was, knot, twisting, the groin, his leg is shaking, temperature out of control, sweats, limp in right leg, pain behind knee."

contact his cardiologist, the emergency room would be "appropriate."

Mrs. Simmons testified to her recollection of the conversation finally held between her husband and Dr. Urquhart on 12 March 1987. As she picked up an extension phone in the residence and listened, she heard Mr. Simmons inform Dr. Urquhart that he had been trying to reach her without success. He then recited his symptoms, including leg pain and soreness, as well as swelling and increased discomfort in the groin area.

Dr. Urquhart, after hearing the symptoms, simply replied, "it is normal to have discomfort after a procedure like you had. The reason you didn't feel any pain in the hospital is because we had you so heavily sedated to keep your blood pressure under control."

Mr. Simmons expressed concern over the possibility of a blood clot or blood poisoning, but Dr. Urquhart reassured him, concluding, "No, Mr. Simmons. If you had a blood clot or blood poisoning, we would not have let you leave the hospital." Mr. Simmons replied, "Well, I just wanted your reassurance."

At that moment in the conversation, Mrs. Simmons interrupted and inquired, "Well what about your leg? What about the pain in your leg and your knee?" But before Dr. Urquhart could reply, Mr. Simmons interjected, stating, "That's all right. I'll just wait till Monday and see Dr. Tullner." Following that response, Mrs. Simmons hung up the telephone and heard her husband once again tell Dr. Urquhart that he just wanted her reassurances.

Appellants produced evidence at trial to suggest that Dr. Urquhart, after receiving the urgent message to call the Simmons' residence on 12 March, waited a number of hours before calling.

### Appellees' Case

Appellees' version of this portion of the facts painted a different picture of the immediate events leading up to Mr. Simmons's death. Siegler and Dr. Urquhart both testified

that they repeatedly urged Mr. Simmons to seek medical attention, but he consistently refused. Although Dr. Urquhart admitted receiving the messages from Ms. Siegler, she denied that Siegler ever informed her of the symptoms indicating existence of a blood clot.

Dr. Urquhart testified that she spoke with Mr. Simmons by telephone on the evening of 11 March as well as 12 March. On 11 March, after Mr. Simmons described his symptoms to her, she pleaded with him to go to the emergency room. Mr. Simmons repeatedly refused, despite her warnings that he had "a life-threatening problem." Based on his stubborn unwillingness to seek immediate medical attention, Dr. Urquhart told Mr. Simmons that he was required to visit the MCA Bethesda office on the following morning for a checkup. He agreed.

On the following morning, 12 March, Dr. Urquhart was informed by a receptionist that Mr. Simmons had called to inform her that he was feeling better and would not be coming to his appointment.

Dr. Urquhart's recollection of the 12 March conversation directly contradicted the version offered by Mrs. Simmons. According to Dr. Urquhart, the telephone conversation on the evening of 12 March was "very similar" to the one held on the previous night. After Mr. Simmons informed her that his femoral artery "hurt when he pressed" it, Dr. Urquhart instructed him to go to the emergency room at Washington Adventist. Mr. Simmons, however, downplayed the significance of his pain and refused to go to the emergency room. Initially, Mr. Simmons only agreed to attend his routine check up with Dr. Tullner scheduled for Monday, 16 March. Dr. Urquhart convinced him to visit Dr. Tullner at MCA's Laurel office on the following morning, 13 March, if he absolutely refused to go to the emergency room. Mr. Simmons agreed to that arrangement.

Testimony concerning Mr. Simmons's repeated refusals to seek medical attention also was supported by Mrs. Simmons, who admitted that, prior to and following his conversation with

Dr. Urquhart, she repeatedly begged him to go to the emergency room. He refused.

\* \* \* \* \* \*

Returning to the undisputed factual background, Mr. Simmons never made it to the MCA Laurel office on 13 March 1987. Following his conversation with Dr. Urquhart on the evening of 12 March, Mr. Simmons went to bed. Mrs. Simmons testified that she was awakened in the middle of the night by her husband's screams. She found him lying in the hallway. Mrs. Simmons called 911, and Mr. Simmons was taken by ambulance to Laurel–Beltsville Hospital. He was pronounced dead at 3:25 a.m. on 13 March 1987, approximately seven hours after speaking with Dr. Urquhart.

Following presentation of the evidence, the parties submitted their requested instructions to the jury. Appellants submitted an instruction, *inter alia,* regarding the doctrine of last clear chance. Apparently based on a discussion held in the trial judge's chambers, the court refused to give the requested instruction. Following the court's actual instructions to the jury, appellants' counsel noted his objection to the court's refusal to instruct on the doctrine of last clear chance, citing a recent Court of Special Appeals decision in *Myers v. Alessi,* 80 Md.App. 124, 560 A.2d 59, *cert. denied,* 317 Md. 640, 566 A.2d 101 (1989).

The court, relying on a statement in *Myers,* denied appellants' request, concluding:

"In addition, the fresh negligent act must come [at] a time when the defendant can but the plaintiff cannot avoid the accident." [*Myers v. Alessi,* 80 Md.App. 124, 135, 560 A.2d 59 (1989) ]

I find from the facts in this case that . . . there is a good deal of evidence that shows that the deceased, had he gone to the hospital, . . . that he still could have avoided this and he still would have lived, but he didn't. He did not go to the hospital despite the fact that his wife told him to do it. . . . Dr. Cheetham told him to go to the hospital. . . . That is independent evidence that is essentially unrebutted. So,

clearly, in my view, the deceased had an opportunity after, let's say 8:00 o'clock or even 9:00 o'clock ... to do something himself. It wasn't precipitous, except that several hours later he did die. But, he didn't do anything. He just simply didn't do it. So, in my view, last clear chance simply would not apply.

On 27 May 1993, the jury returned a verdict. They found appellees negligent, but also found Mr. Simmons contributorily negligent. Accordingly, judgment was entered in favor of appellees. Appellants noted a timely appeal.

## DISCUSSION

The Court of Appeals, in its opinion reversing and remanding this matter to us, stated:

> We note that in the instant case, the trial court's determination not to give a last clear chance instruction may have been based on the assumption that Mr. Simmons's negligence, if any, was his continued refusal to go to the emergency room or to seek medical attention after his telephone conversation with Dr. Urquhart, as well as the evidence that it was this continued refusal to seek medical attention that was a contributing cause of his death. If the jury in the instant case found that Dr. Urquhart's telephone call of March 12, 1987 reassured Mr. Simmons that his symptoms did not require medical attention, that may be relevant to the issue of whether Mr. Simmons ceased to be negligent because of such reassurance, rather than the issue of last clear chance. Mr. Simmons was still experiencing the same or more severe symptoms after Dr. Urquhart's telephone call and he continued to refuse to seek medical attention after that telephone call. The trial court pointed out that the evidence established that if Mr. Simmons had gone to the hospital "within one-half hour or an hour of the time that he actually died, that he still ... would have lived." Whether the failure to give a last clear chance instruction

necessitates a new trial is an issue that should be addressed by the Court of Special Appeals. At 20–21, 660 A.2d 412.

■ Appellants assert that the trial court committed reversible error by failing to instruct the jury concerning the doctrine of "last clear chance." The parties in the case *sub judice* have not concerned themselves with whether the doctrine of last clear chance is applicable to cases involving medical malpractice torts. We recognize that the doctrine is most often discussed in motor torts and the like. Nevertheless, we have identified no organic reason why, under the proper facts, the doctrine of last clear chance would not be applicable in medical malpractice cases. We note that at least one other jurisdiction has evaluated the application of the doctrine in the context of medical malpractice. *Mackey v. Greenview Hospital, Inc.,* 587 S.W.2d 249, 257–59 (Ky.App. 1979) (considering fully but denying application of last clear chance because the physician could not have discovered the danger while there was time to avoid the injury); *see also,* Sharon W. Murphy, *Contributory Negligence in Medical Malpractice: Are the Standards Changing to Reflect Society's Growing Health Care Consumerism?,* 17 U.Dayton L.Rev. 151, 155 (1991) (identifying the application of the last clear chance doctrine as appropriate in the context of medical malpractice).

■ The last clear chance doctrine "presupposes a perilous situation created or existing through both a defendant's negligence and plaintiff's contributory negligence and assumes that there was a time after such negligence has occurred when the defendant could, and the plaintiff could not, by the use of the means available, avert the accident." *Johnson v. Dortch,* 27 Md.App. 605, 614, 342 A.2d 326, *cert. denied,* 276 Md. 745 (1975) (examining last clear chance doctrine in a boulevard law case). In the context of medical malpractice, a physician's act of primary negligence may not be used again to serve as the last clear chance of avoiding injuries. *Myers v. Alessi,* 80 Md.App. 124, 135, 560 A.2d 59, *cert. denied,* 317 Md. 640, 566

A.2d 101 (1989) (patient who failed to make follow-up appointment with physician was not entitled to argue that doctor's original failure to detect cancer was sufficient to establish fresh act of negligence).

■ The trial court concluded that the requested instruction was not warranted because Mr. Simmons, despite his wife's pleas, refused to go to the hospital following his 12 March conversation with Dr. Urquhart. The court decided that this opportunity and refusal removed the last clear chance doctrine from the realm of the jury.

The asserted obligation of the court to give the requested instruction required the existence of evidence to support both a fresh act of negligence on the part of Dr. Urquhart and the inability of Mr. Simmons to avert the resulting harm. The trial court's ruling does not indicate that it questioned the viability of appellants' claim that Dr. Urquhart was negligent on more than one instance.[4] Rather, the court took issue with the second requirement under the last clear chance doctrine, namely the plaintiff's inability to avoid the resulting harm. The court assumed that Mr. Simmons could have avoided his own death by seeking medical attention following his discussion with Dr. Urquhart. The court apparently ignored, discounted, or failed to consider the testimony of Mrs. Simmons, relating the **effect** of Dr. Urquhart's reassurances upon her husband. Mrs. Simmons testified that her husband relied on Dr. Urquhart's diagnosis that his condition was normal to conclude that his life was not in danger.

■ In general, patients are entitled legally to rely on their physician's advice. *DiLeo v. Nugent,* 88 Md.App. 59, 73, 592 A.2d 1126, *cert. granted,* 325 Md. 18, 599 A.2d 90 (1991),

---

4. Appellants argued that Dr. Urquhart originally negligently failed to respond to Mr. Simmons's messages, despite Ms. Siegler's recitation of symptoms suggesting the existence of a blood clot. Regardless of any interim contributorily negligent failures by Mr. Simmons to seek medical attention, appellants asserted that Dr. Urquhart, when she finally did speak to Mr. Simmons on 12 March, ultimately was negligent in failing to diagnose his fatal condition.

*dismissed,* 16 Sept. 1992 (holding that jury instruction to the same effect was appropriate); *Santoni v. Moodie,* 53 Md.App. 129, 138, 452 A.2d 1223 (1982),[5] *cert. denied,* 295 Md. 527 (1983). This reliance, however, must be reasonable or justifiable in order for patients to satisfy their obligations to exercise reasonable care in safeguarding their own health and safety. *See Schaerf,* 48 Md.App. at 511, 428 A.2d 94; *see also Wegad,* 326 Md. at 416, 605 A.2d 123 (relying on *Schaerf* to conclude that, in the context of an accountant's alleged malpractice, "a proper jury instruction should explain that a client's *reasonable* or *justifiable* reliance on his or her accoun-

---

**5.** In *Moodie v. Santoni,* the Court of Appeals reversed a holding by this court in a related case, *Santoni v. Schaerf,* 48 Md.App. 498, 428 A.2d 94 (1981) (patient's case against the individual prescribing physician employed by the Baltimore City Health Department), affirming the trial court's decision to remove from the jury's consideration the issue of contributory negligence where a patient took tuberculosis medication as prescribed by a physician employed by the city health plan department. *Moodie,* 292 Md. at 583, 441 A.2d 323. The Court of Appeals reversed because evidence was presented at trial to suggest that the patient, although instructed to the contrary, failed repeatedly to notify the Public Health Service that he was experiencing symptoms indicating the existence of hepatitis. *Id.* at 591, 441 A.2d 323. Accordingly, the Court concluded that the patient's alleged failure to follow the Health Department's instructions entitled the physician and Health Department to a contributory negligence instruction. *Id.*

In a later opinion involving an accountant's malpractice claim, *Wegad v. Howard Street Jewelers,* 326 Md. 409, 605 A.2d 123 (1992), the Court of Appeals commented about the effect of *Moodie v. Santoni* on a patient's entitled reliance on his or her physician's advice. In *Wegad,* the Court stated:

Making no express comment as to whether Mr. Santoni was entitled to rely on his doctor's advice, this Court looked to Mr. Santoni's failure to act prudently upon other facts he knew or should have known. Thus, the rationale of this Court's decision in *Moodie v. Santoni* is that a patient's failure to otherwise act to protect himself is not in every case justified by his reliance on his doctor's knowledge and skill.

*Wegad,* 326 Md. at 416, 605 A.2d 123. The *Wegad* Court merely re-emphasized the sentiment espoused in *Moodie* that patients categorically may not use reliance on their doctors to excuse their own undisputed failures to use reasonable care in relating to their medical providers every symptom indicating the existence of injury. The *Moodie* and *Wegad* decisions do not affect directly our holding in the instant case, therefore, because the parties adamantly dispute whether Mr. Simmons related the important symptoms to Dr. Urquhart.

tant satisfies its obligation to exercise reasonable care in safeguarding its interests.").

In *DiLeo v. Nugent*, we set forth when the application of this principle would be appropriate:

[A] patient is not in a position to diagnose her own ailments. . . . As a consequence, it is not contributory negligence for a patient to follow a doctor's instructions or rely on the doctor's advice, to fail to consult another doctor when the patient has no reason to believe that the doctor's negligence has caused her injury, or to fail to diagnose her own illness.

*Id.* Moreover, a patient maintains no duty to either question by himself or get a second opinion regarding medical advice given to him by his physician. *Santoni*, 53 Md.App. at 139, 452 A.2d 1223. The relationship "assumes trust and confidence on the part of the patient in the capacity and skill of the physician." *Id., quoting, Halverson v. Zimmerman*, 60 N.D. 113, 232 N.W. 754, 759 (1930).

Mrs. Simmons's testimony, if believed by the fact finder, would have established that Mr. Simmons did not comprehend that his condition left him in a state of imminent peril. Had the jury been given the last clear chance instruction or some other instruction that fairly covered appellants' evidentiary theory of its case, it could have concluded, based on Mrs. Simmons's testimony, that Mr. Simmons had no cause to believe, and, indeed, was under no duty to foresee, that Dr. Urquhart would fail to diagnose his condition. The jury could have concluded further that this lack of foreseeability of harm left Mr. Simmons powerless to judge whether Dr. Urquhart's advice was in his best interest. In essence, appellants' version of the 12 March 1987 conversation may have entitled them to argue that Mr. Simmons's trust in the skill of Dr. Urquhart left him ignorant of and unable to avert the resulting harm.

The trial court's reasoning for its refusal to give the requested instruction, or some other instruction adequately covering the appellants' theory, was inappropriate. The court implicitly rejected appellants' testimonial evidence regarding

the 12 March telephone call and, instead, credited appellees' testimony concerning the content of the call. This is not the proper standard by which the court should have decided whether the requested instruction by appellants was appropriate. Given the conflicting testimony, the court should not have resolved whose evidence it found more credible as part of its decision whether to give the requested instruction.

■ Ordinarily, a litigant is entitled to have a requested instruction given if the theory it seeks to have presented to the jury is a correct exposition of the law, that law is applicable in view of the evidence before the jury, and the substance of the requested instruction is not covered by the instructions actually given. *Holman v. Kelly Catering, Inc.,* 334 Md. 480, 495–96, 639 A.2d 701 (1994); *Wegad,* 326 Md. at 414, 605 A.2d 123; *but see Dover Elevator Co. v. Swann,* 334 Md. 231, 256–62, 638 A.2d 762 (1994). Whether a last clear chance instruction will be appropriate upon retrial will necessarily be deferred. It is worth noting, however, that such an instruction as was requested in the trial reviewed here may not be the only way to instruct the jury properly based on appellants' evidence and their theory of the case. The doctrine of last clear chance, as applied in tort law, aims at resolving the issue of proximate cause. That context may leave the trial court on remand with more than one way in which to address the issues presented by appellants' version of the facts, assuming they remain static.

If at any new trial appellees' evidence supports and they request an instruction on either contributory or concurrent negligence on the part of Mr. Simmons, the trial court will need to instruct the jury, in the context of determining whose negligence led to Mr. Simmons's death, to decide whose version of the 12 March telephone conversation it believed. If the jury were to believe Dr. Urquhart's version, it would be entitled to conclude that Mr. Simmons's negligent failure to seek immediate medical attention following the conversation was the proximate cause of his death and that any previous negligence on the part of Dr. Urquhart in failing to respond to

his calls was not the cause. If, however, the jury chose to believe Mrs. Simmons's version, it would be entitled to conclude that Mr. Simmons's reliance on Dr. Urquhart's reassurances was warranted. Under those circumstances, Dr. Urquhart's negligent failure to diagnose and warn Mr. Simmons would constitute the proximate cause of Mr. Simmons's death. Under this scenario, a last clear chance instruction may be needed or appropriate.

On the facts of the case *sub judice*, we hold that the trial court failed to give proper consideration to Mrs. Simmons's testimony when it decided what instructions to give to the jury. Appellants were entitled to an appropriate instruction based on this evidence. The refusal of the court to do so constitutes reversible error.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEES.**