643 A.2d 487

**Angela C. SIMMONS, et al.**

v.

**Joann URQUHART, et al.**

**No. 1314, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

June 30, 1994.

Certiorari Granted Nov. 16, 1994.

Robert G. Samet (Jonathan S. Beiser and Ashcraft & Gerel, on the brief), Rockville, for appellants.

H. Kenneth Armstrong (Maura J. Condon and Armstrong, Donohue & Ceppos, Chartered, on the brief), Rockville, for appellees.

Argued before WILNER, C.J., and DAVIS and HARRELL, JJ.

HARRELL, Judge.

Angela C. Simmons, and her children, Sharon, David, and Mark Simmons, appellants, sued Joann Urquhart, M.D., Wil-

liam Tullner, M.D., and Maryland Cardiology Associates, P.A. (MCA), appellees, for wrongful death and survivorship malpractice following the death of Anthony Simmons, the husband and father of appellants. A jury in the Circuit Court for Montgomery County found that, although Dr. Urquhart negligently failed to advise Mr. Simmons that his condition required immediate medical attention, the decedent's contributory negligence barred appellants' ability to recover against appellees. This appeal followed.

## ISSUES

We have re-phrased the following issues raised by the Simmonses:

I.  The trial court abused its discretion when it held that venue was improper in Prince George's County and, consequently, transferred the case to Montgomery County.

   A.  Venue was proper in Prince George's County.

   B.  Appellees were precluded from arguing for a transfer based on *forum non conveniens* because they failed to argue that issue in their pleadings or during the hearing on their Motion to Dismiss or Transfer.

   C.  The trial court failed to balance properly the convenience of the parties and witnesses, as well as other factors, in determining the appropriate forum.

II.  The trial court committed reversible error by failing to give the "last clear chance" jury instruction requested by appellants.

For reasons set forth below, we shall reverse the trial court's decision regarding venue. Our reversal based on Issue I permits us to decline deciding Issue II. We shall consider Issue II, nevertheless, for the instructional benefit of the trial court on remand.

## FACTS

It is undisputed that, at the time the events giving rise to this appeal occurred, MCA maintained three offices. Two

offices were located in the Montgomery County areas of Bethesda and Silver Spring, while the other was located in the Laurel area of Prince George's County. The parties disputed whether MCA's principal office was located in Montgomery County or Prince George's County.[1] The cardiologists comprising MCA, including Drs. Tullner and Urquhart, enjoyed privileges at various hospitals located in both Montgomery and Prince George's Counties.

Mr. Simmons, a resident of Prince George's County, volunteer fireman, and former ambulance driver, visited MCA's Laurel office on 25 February 1987 complaining of chest pains. On 4 March 1987, at the request of Dr. Tullner, Simmons was admitted to the Washington Adventist Hospital located in Montgomery County. On the following day, Dr. Tullner performed a cardiac catheterization on Mr. Simmons to determine the existence or extent of any arterial blockage. The procedure entails inserting a catheter, or thin tube, into the groin area, and advancing it through the body until it reaches the coronary arterial region. Dye is then injected into the arteries through the catheter and x-rays are taken of the coronary area. The dye outlines the interior of the arteries so that blockages occurring are detectable on the x-rays. The x-rays of Mr. Simmons's arterial passages demonstrated no significant blockage.

Following his performance of Mr. Simmons's catheterization, Dr. Tullner left the area to attend a medical convention. Dr. Tariq Mahmood, the third physician associated with MCA, also attended the convention. The only MCA cardiologist remaining on duty in the vicinity was Dr. Urquhart, who, at the time of Mr. Simmons's hospitalization, was approximately eight and one-half months pregnant.

---

1. Appellees offered the affidavit of Dr. Tullner, in his capacity as representative of MCA, to attest that the medical practice's principal office was located in Montgomery County. In contrast, appellants offered the curriculum vitae of Dr. Tullner, which listed the Laurel office as his business address, to support their position that MCA's principal office was located in Prince George's County.

Prior to discharging Simmons on 9 March 1987, Dr. Urquhart checked his hospital chart, evaluated his blood pressure, examined his heart and lungs, and gave Simmons routine discharge instructions and medications. Dr. Urquhart told Simmons to call her if he experienced any problems. She did not warn him specifically about post-catheterization symptoms, such as pain and fever, commonly associated with a potentially deadly condition known as pulmonary embolization. Pulmonary embolization occurs when a blood clot forms in the leg near the catheterization site and then breaks loose and travels to the lung. On 13 March, seven days after the catheterization, Mr. Simmons died at Greater Laurel Beltsville Hospital in Prince George's County. An autopsy determined the cause of death to be pulmonary embolism.

Consequently, appellants commenced a wrongful death and survivorship malpractice action against appellees with the Health Claims Arbitration Office. After preliminary discovery, the parties waived arbitration. On 5 September 1991, appellants filed a Complaint and Jury Demand in the Circuit Court for Prince George's County. On 16 September 1991, appellees filed a Motion to Dismiss or, in the alternative, a Motion to Transfer the action to Montgomery County, alleging improper venue.

Oral argument on the venue motion was held on 4 February 1992. Appellees claimed that any "contacts" that would arise in the case occurred in various areas of Montgomery County. Appellee's counsel argued that the "totality of the circumstances" involved demonstrated the need to transfer the venue. Specifically, appellees' counsel argued the following "contacts" with Montgomery County: 1) all three physicians associated with MCA were residents of Montgomery County;[2] 2) two of MCA's three offices, including its principal office, were located in Montgomery County; 3) the catheterization took

---

2.  During the events giving rise to the case, Dr. Urquhart was a resident of the District of Columbia. In the interim period between Mr. Simmons's death and the appellants' filing of the Complaint, however, Dr. Urquhart moved to Montgomery County.

place in Montgomery County; 4) telephone conversations between an MCA receptionist and the Simmonses prior to Mr. Simmons's death involved the MCA Silver Spring office; and, 5) relevant telephone conversations between Mr. Simmons and his treating physician, Dr. Wayman W. Cheetham, involved Dr. Cheetham's Takoma Park office located in Montgomery County.

In turn, appellants argued that they were entitled to proceed in Prince George's County because appellees carried on regular business there at their main office in Laurel and practiced at Greater Laurel–Beltsville Hospital where Mr. Simmons died. Appellants emphasized that while many incidents occurred in Montgomery County, the contacts with Prince George's County were sufficient to afford them the election to file there.

The judge recognized that, although appellees' counsel attempted to prove his cause on the grounds of venue, his argument actually was based on the doctrine of *forum non conveniens*. In this regard, the court stated, "So, your response to that particular [venue] statute and his argument that he's entitled to proceed in Prince George's County on that basis is essentially a forum non conveniens argument." To which, appellees' counsel replied

I think you could probably draw that analogy. I think that there has to be some discretion on your part in evaluating the venue in this case and that is why[,] in presenting my oral argument to you[,] I'm trying to present it to you with the totality of circumstances that are involved.

The court transferred the action to Montgomery County, stating:

The Court has reviewed 6–201 and 6–202 [Md.Code (1974, 1989 Repl.Vol.), §§ 2–601, 2–602 of the Courts and Judicial Proceedings Article] as well as heard the arguments of counsel and read the memorandums and as well as the exhibits and the Court feels that the motion for—obviously I'm not going to dismiss the case, but I do believe it should

be transferred to Montgomery County and I will sign an order to that effect.

At the jury trial conducted in the Circuit Court for Montgomery County, the parties vigorously disputed the number and substance of the communications between Dr. Urquhart, the MCA office in Bethesda, and the decedent following his hospital discharge. Appellants argued that Dr. Urquhart negligently failed to respond to Mr. Simmons's messages indicating his severe physical condition and negligently failed to diagnose his ailment when she finally did contact him. Appellees defended by arguing that Mr. Simmons's repeated refusals to seek immediate medical attention amounted to contributory negligence. The parties' respective versions of the facts relevant to this appeal follow.

### Appellants' Case

According to the testimony of both Mrs. Simmons and Ms. Sharon Siegler, the MCA Bethesda office manager, Mr. Simmons repeatedly called the MCA Bethesda office in attempts to reach Dr. Urquhart.[3] Despite testimony from Siegler that Mr. Simmons's messages were given to Dr. Urquhart as recorded, Dr. Urquhart never returned his calls.

Mr. Simmons called his diabetes physician, Wayman W. Cheetham, M.D., because he was concerned about the symptoms he was experiencing following the catheterization and distressed over his inability to reach his cardiologist. Dr. Cheetham told Mr. Simmons that "it was very important for him to try to contact his physician directly. And given the circumstances that he was describing, if he was unable to do

---

**3.** In support of this fact, appellants entered into evidence notes taken by Siegler during three telephone conversations between herself and Mr. Simmons following his hospital discharge. On 10 March 1987, Ms. Siegler's notations suggested Mr. Simmons was experiencing pain in the left side of his stomach and a fever of approximately 102 degrees. On 11 March 1987, the note stated "hematoma from cath.," "fever," and "pain." The 12 March 1987 notes indicated Mr. Simmons was experiencing "sharp pain down above where the cath was, knot, twisting, the groin, his leg is shaking, temperature out of control, sweats, limp in right leg, pain behind knee."

so, that he had to make arrangements to be seen by someone." Dr. Cheetham instructed Mr. Simmons that if he could not contact his cardiologist, the emergency room would be "appropriate."

Mrs. Simmons testified to her recollection of the conversation finally held between her husband and Dr. Urquhart on 12 March 1987. As she picked up an extension phone in the residence and listened, she heard Mr. Simmons inform Dr. Urquhart that he had been trying to reach her without success. He then recited his symptoms, including leg pain and soreness, as well as swelling and increased discomfort in the groin area.

Dr. Urquhart, after hearing the symptoms, simply replied, "it is normal to have discomfort after a procedure like you had. The reason you didn't feel any pain in the hospital is because we had you so heavily sedated to keep your blood pressure under control."

Mr. Simmons expressed concern over the possibility of a blood clot or blood poisoning, but Dr. Urquhart reassured him, concluding, "No, Mr. Simmons. If you had a blood clot or blood poisoning, we would not have let you leave the hospital." Mr. Simmons replied, "Well, I just wanted your reassurance."

At that moment in the conversation, Mrs. Simmons interrupted and inquired, "Well what about your leg? What about the pain in your leg and your knee?" But before Dr. Urquhart could reply, Mr. Simmons interjected, stating, "That's all right. I'll just wait till Monday and see Dr. Tullner." Following that response, Mrs. Simmons hung up the telephone and heard her husband once again tell Dr. Urquhart that he just wanted her reassurances.

Appellants produced evidence at trial to suggest that Dr. Urquhart, after receiving the urgent message to call the Simmons' residence on 12 March, waited a number of hours before calling.

*Appellees' Case*

Appellees' version of the facts painted a different picture of the events leading up to Mr. Simmons's death. Siegler and Dr. Urquhart both testified that they repeatedly urged Mr. Simmons to seek medical attention, but he consistently refused. Although Dr. Urquhart admitted receiving the messages from Ms. Siegler, she denied that Siegler ever informed her of the symptoms indicating existence of a blood clot.

Dr. Urquhart testified that she spoke with Mr. Simmons by telephone on the evening of 11 March as well as 12 March. On 11 March, after Mr. Simmons described his symptoms to her, she pleaded with him to go to the emergency room. Mr. Simmons repeatedly refused, despite her warnings that he had "a life-threatening problem." Based on his stubborn unwillingness to seek immediate medical attention, Dr. Urquhart told Mr. Simmons that he was required to visit the MCA Bethesda office on the following morning for a checkup. He agreed.

On the following morning, 12 March, Dr. Urquhart was informed by a receptionist that Mr. Simmons had called to inform her that he was feeling better and would not be coming to his appointment.

Dr. Urquhart's recollection of the 12 March conversation directly contradicted the version offered by Mrs. Simmons. According to Dr. Urquhart, the telephone conversation on the evening of 12 March was "very similar" to the one held on the previous night. After Mr. Simmons informed her that his femoral artery "hurt when he pressed" it, Dr. Urquhart instructed him to go to the emergency room at Washington Adventist. Mr. Simmons, however, downplayed the significance of his pain and refused to go to the emergency room. Initially, Mr. Simmons only agreed to attend his routine check up with Dr. Tullner scheduled for Monday, 16 March. Dr. Urquhart convinced him to visit Dr. Tullner at MCA's Laurel office on the following morning, 13 March, if he absolutely refused to go to the emergency room. Mr. Simmons agreed to that arrangement.

Testimony concerning Mr. Simmons's repeated refusals to seek medical attention also was supported by Mrs. Simmons, who admitted that, prior to and following his conversation with Dr. Urquhart, she repeatedly begged him to go to the emergency room. He refused.

*     *     *     *     *     *

Mr. Simmons never made it to the MCA Laurel office on 13 March 1987. Following his conversation with Dr. Urquhart on the evening of 12 March, Mr. Simmons went to bed. Mrs. Simmons testified that she was awakened in the middle of the night by her husband's screams. She found him lying in the hallway. Mrs. Simmons called 911, and Mr. Simmons was taken by ambulance to Laurel–Beltsville Hospital. He was pronounced dead at 3:25 a.m. on 13 March 1987, approximately seven hours after speaking with Dr. Urquhart.

Following presentation of the evidence, the parties submitted their requested instructions to the jury. Appellants submitted an instruction, *inter alia,* regarding the doctrine of last clear chance. Apparently based on a discussion held in the trial judge's chambers, the court refused to give the requested instruction. Following the court's actual instructions to the jury, appellants' counsel noted his objection to the court's refusal to instruct on the doctrine of last clear chance, citing a recent Court of Special Appeals decision in *Myers v. Alessi.*

The court, relying on a statement in *Myers,* denied appellants' request, concluding:

"In addition, the fresh negligent act must come [at] a time when the defendant can but the plaintiff cannot avoid the accident." [*Myers v. Alessi,* 80 Md.App. 124, 135, 560 A.2d 59 (1989).]

I find from the facts in this case that ... there is a good deal of evidence that shows that the deceased, had he gone to the hospital, ... that he still could have avoided this and he still would have lived, but he didn't. He did not go to the hospital despite the fact that his wife told him to do it.... Dr. Cheetham told him to go to the hospital.... That is independent evidence that is essentially unrebutted. So,

clearly, in my view, the deceased had an opportunity after, let's say 8:00 o'clock or even 9:00 o'clock ... to do something himself. It wasn't precipitous, except that several hours later he did die. But, he didn't do anything. He just simply didn't do it. So, in my view, last clear chance simply would not apply.

On 27 May 1993, the jury returned a verdict. They found appellees negligent, but also found Mr. Simmons contributorily negligent. Accordingly, judgment was entered in favor of appellees. On 24 June 1993, appellants noted a timely appeal.

## I.

Appellants argue that the Circuit Court for Prince George's County abused its discretion by ruling that venue was improper and transferring the case to Montgomery County. Appellants further maintain that appellees' mistaken reliance on the venue statute during the hearing on the motion to dismiss or transfer precludes them from now arguing that the Circuit Court for Prince George's County made the proper decision to transfer, nevertheless, based on the doctrine of *forum non conveniens*.

We agree that venue was proper in Prince George's County. The record sufficiently demonstrates, however, that the hearing court made its finding based on the doctrine of *forum non conveniens*. While we conclude the independent determination by the hearing court in this regard *did not* constitute an abuse of discretion, we hold that the court ultimately erred in concluding that transfer was appropriate.

## A.

The relevant venue statute provides, in pertinent part, that:

(a) A civil action shall be brought in a county where the defendant resides, carries on a regular business, is employed, or habitually engages in a vocation.

(b) If there is more than one defendant, and there is no single venue applicable to all defendants, under subsection (a), all may be sued in a county in which any one of them could be sued, or in the county where the cause of action arose.

Md.Code (1974, 1989 Repl.Vol.), § 6–201 of the Courts and Judicial Proceedings Article. One who engages regularly in business in one county may be sued there even though his principal place of business is in another county. *Dodge Park Enters. v. Welsh*, 237 Md. 570, 573, 207 A.2d 503 (1965).

■ Appellees maintain that section (b) of § 6–201 prohibited appellants from suing them in Prince George's County. More than one venue was applicable to all appellees, however, and therefore section (b) did not apply. It was undisputed that Drs. Urquhart and Tullner, and MCA, "carried on regular business" in Prince George's County through the Laurel office of the MCA practice. It was also undisputed that all three carried on regular business in Montgomery County through their Bethesda and Rockville offices. Both Prince George's County and Montgomery County constituted appropriate venues under the statute.

If multiple venues are proper under section 6–201, then the plaintiff possesses the right to choose the one in which to proceed. *See Wilde v. Swanson*, 314 Md. 80, 94, 548 A.2d 837 (1988). Consequently, appellants properly exercised their option under § 6–201(a) to sue in Prince George's County where all appellees carried on regular business.

### B.

Appellants argue that our analysis should cease at this juncture because appellees based their motion solely on the grounds of venue and failed to raise specifically the issue of *forum non conveniens*. Although they share some characteristics, the concepts of venue and *forum non conveniens* indeed are procedurally distinct.

■ Generally, the right to change the venue of an action is purely statutory. *See* 92 C.J.S. *Vendor & Purchaser* § 127 (1955). Therefore, once a plaintiff has chosen a proper forum as defined by the relevant venue statutes, the court maintains no discretion to alter the plaintiff's decision based on a lack of venue. *See id.; see also Wilde,* 314 Md. at 93–94, 548 A.2d 837.

■ In comparison, *forum non conveniens* refers to the discretionary power of a court to transfer an action whenever it appears that the cause may be tried more appropriately in another valid venue. *See* Md.Rule 2–327(c). *Forum non conveniens* is based on the assumption that both the original court and some other court fulfill all the applicable venue requirements. 5 The Guide to American Law, at 286 (West 1984). In effect, *forum non conveniens* provides the defendant with the opportunity to prove that although a plaintiff's choice of forum may be valid under a given venue statute, private and public interest factors weigh heavily in favor of transferring the action to another appropriate forum. *See id.* Accordingly, *forum non conveniens* allows the court, when certain conditions exist, to override the plaintiff's choice of forum.

■ In Maryland, the doctrine of *forum non conveniens* is embodied in Rule 2–327(c), which states that "On the motion of any party, the court may transfer any action to any other circuit court where the action might have been brought if the transfer is for the convenience of the parties and witnesses and serves the interest of justice." Md.Rule 2–327(c).

The record indicates that appellees raised their motion to transfer based on the venue statute rather than Rule 2–327(c). In a memorandum, accompanying their Motion to Dismiss or Transfer, appellees expressly stated that "plaintiffs' reliance on a *forum non conveniens* case is misplaced; *Odenton [Odenton Development v. Lamy,* 320 Md. 33, 575 A.2d 1235 (1989) ] is a case that relies on Annotated Code of Md.Rule 2–327(c) and *not* Cts. and Jud.Proc. Art. § 6–201(a) as cited by defendants." Moreover, during the hearing, appellants' counsel

used words and phrases such as "contacts" and "totality of the circumstances", and repeatedly cited the venue statute as the basis for appellees' motion. Indeed, when the court inquired as to whether appellees' were suggesting a transfer based on *forum non conveniens,* appellees' counsel replied, "I think you could probably draw that analogy. I think there has to be some discretion on your part in evaluating the venue in this case . . . ." It is clear that appellees did not raise sufficiently the issue of *forum non conveniens* as a grounds for transfer.

Our analysis does not end here as appellants request because the record demonstrates that the court, on its own initiative, invoked the doctrine of *forum non conveniens* as a basis for transfer.[4] We have not considered previously the question this conduct poses. Does a trial court have the authority, under Rule 2–327(c), to transfer an action on its own initiative?

Appellants argue that, under Rule 2–327(c), trial courts do not possess the authority to transfer cases on their own initiative because the rule states that a trial court may transfer the action "on the motion of any party." Md.Rule 2–327(c). The language of the rule neither prohibits conclusively the court from transferring an action on its own initiative, nor provides the court the affirmative license to do so. Accordingly, we must look to sources beyond the rule to interpret its meaning.

The Court of Appeals' Standing Committee on Rules of Practice and Procedure (the Committee) briefly considered the issue before us. Attorneys involved in asbestos litigation requested that the Committee amend Rule 2–327(c) "to clarify the power of the court to do on its own initiative what the rules provide may be done on motion." Minutes of the Rules Committee, meeting of 18–19 May 1990, at 9. The Committee

---

**4.** During the hearing the court acknowledged that if appellees "carry on regular business in Prince George's County then it matters not that their business is also or even principally carried on in Montgomery County." Later, the court suggested the proper focus was a *forum non conveniens* analysis.

tabled the issue for more in-depth consideration at a later date. *See* Minutes of the Rules Committee, meeting of 15–16 June 1990, at 44. Unfortunately, final resolution of the confusion surrounding the trial court's inherent authority to transfer, *inter alia,* apparently never occurred.[5]

Minutes from the 15–16 June meeting reflect the Committee's general desire to eliminate the confusion surrounding the trial court's authority to act on its own initiative. *See* Minutes of the Rules Committee, meeting of 15–16 June 1990, at 42–43. In addition, various comments by Committee members suggest support for granting trial courts such authority. For example, Mr. Sykes emphasized that the essence of the issue lay in the "substance of the rules" rather than the differences in "language formulas." *Id.* at 43. Chief Judge Wilner of this Court, and Chairman of the Committee, proposed a "general rule which provides that unless prohibited by rule, the court can do on its own initiative what it can do on motion." *Id.* When Mr. Lombardi stated that "it could also be worded vice versa," Chief Judge Wilner replied that "chances are that there would be more situations where the court can act on its own." *Id.* Finally, Judge Kaplan of the Circuit Court for Baltimore City suggested an option similar to some federal caselaw that would provide for the court to act on its own initiative only "after a hearing, allowing for due process." *Id.*

Chief Judge Wilner also cited *Goins v. State,* 293 Md. 97, 442 A.2d 550 (1982), as precedential support for the position that courts may already possess the inherent authority to transfer on their own initiative. In *Goins,* the Court of Appeals held that a trial court has inherent authority to control its docket except as expressly limited by statute. *Goins,* 293 Md. at 111, 442 A.2d 550. *Goins,* a criminal defendant, appealed the trial court's decision to postpone his trial date beyond the statutorily imposed limitation period where no party had moved to do so. *Id.* at 100, 442 A.2d 550.

---

**5.** Aside from the obvious lack of any amendment to Rule 2–327(c), no available data from the Committee suggests that it ever resolved the issue.

The rule at issue in *Goins,* the former Rule 736, contained the same "on the motion of a party" language as Rule 2–327(c). Recognizing the importance of a trial court's authority to control its own docket, the *Goins* Court concluded that "[a] rule authorizing a litigant to file a procedural motion for this purpose in one respect or another should not be construed to prohibit the court from accomplishing the same object sua sponte unless such construction is compelled by clear language." *Id.* at 111, 442 A.2d 550; *see also Toney v. State,* 74 Md.App. 397, 410, 537 A.2d 1218 (1988), *rev'd on other grounds,* 315 Md. 122, 553 A.2d 696 (1989) (citing *Goins* in its recognition that court may move by its own initiative under Rule 736).[6] The Court's conclusion was supported by a Supreme Court decision to the same effect. *See Goins,* 293 Md. at 111, 442 A.2d 550, *quoting, Link v. Wabash Railroad Company,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) (holding that a trial court was permitted to sua sponte dismiss an action, despite language contained in Federal Rule 41(b), providing that the "defendant may move for dismissal of an action").

Federal caselaw interpreting the federal statute authorizing case transfers, 28 U.S.C. § 1404(a), is additionally instructive because Rule 2–327(c) was derived from it. *See* Md.Rule 2–327, comments; *see also* Paul V. Niemeyer and Linda M. Richards, Maryland Rules Commentary, at 164 (1984) (Rule 2–327(c) "is derived from 28 U.S.C. § 1404(a), and is intended to incorporate the body of law construing that statute."). In contrast to Rule 2–327(c), however, an initial reading of section 1404(a) does not appear to prohibit a court from transferring a case sua sponte. *See* 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a

---

6. In support of the court discretion theory, the Chairman also cited the decision of *Gluckstern v. Sutton,* 319 Md. 634, 574 A.2d 898 (1990), *cert. denied, Henneberry v. Sutton,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990), in which the Court of Appeals held that a trial court may *sua sponte* file a Rule 2–534 motion to alter or amend its own judgment. *Gluckstern,* 319 Md. at 650, 574 A.2d 898.

district court may transfer any civil action to any other district or division where it might have been brought.").

The Supreme Court has held that section 1404(a) vests wide discretion in the trial court to adjudicate motions for transfer. *Odenton Development*, 320 Md. at 40, 575 A.2d 1235, *citing, Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 2244, 101 L.Ed.2d 22, 31 (1988). Several federal courts have interpreted the discretionary power established in section 1404(a) to include a federal district court's authority to transfer a case on its own initiative. *See e.g., Washington Pub. Util. Group v. U.S. District Court for the Western Distr. of Washington*, 843 F.2d 319, 326 (9th Cir.1987) ("[S]ection 1404(a) does not expressly require that a formal motion be made before the court can decide that a change of venue is appropriate."); *Clisham Management, Inc. v. American Steel Building Co., Inc.*, 792 F.Supp. 150, 157 (D.Conn.1992) ("A transfer of venue ... may be made ... by ... the court sua sponte.... [Federal] district courts are accorded broad discretion in a decision to transfer venue and such a decision will not be overturned except on a strong showing that the court abused its discretion."); *Kirby v. Mercury*, 755 F.Supp. 445, 448 (D.D.C.1990) ("The Court has authority to act sua sponte to transfer a case to another federal district court pursuant to 1404(a)."); *Keppen v. Burlington Northern, Inc.*, 749 F.Supp. 181, 183 (N.D.Ill.1990) ("This Court does not have to resolve the standing issue because a court may transfer a case upon its own motion.... Since the parties have been afforded notice and an opportunity to be heard, the court will entertain the motion to transfer.").

Each of these interpretive sources leads us to conclude that Maryland trial courts possess the authority to transfer cases sua sponte under Rule 2–327(c).[7] The Committee members'

---

**7.** We also note that the remaining language of Md.Rule 2–327 supports our interpretation of section (c). Section (c) is one of four components in Rule 2–327 that controls issues related to transfers of actions. Sections (a), (b), and (d) all permit a court to transfer an action on its own initiative. *See* Md.Rule 2–327. In particular, section (d), a 1994 addition to the Rule, was discussed extensively and considered during

remarks and caselaw interpreting the federal corollary to Rule 2–327(c) reflect a general desire to grant trial courts wide discretion in evaluating the need for transfer based on convenience. This view is strengthened further by the Court of Appeals decision in *Goins*, holding that the words "motion of a party" did not require "a construction abrogating the inherent 'power of courts, acting on their own initiative.'" *Goins*, 293 Md. at 111, 442 A.2d 550, *quoting, Link,* 370 U.S. at 630, 82 S.Ct. at 1388–89.

In addition, the docket control concern expressed by the *Goins* Court is equally applicable to Rule 2–327(c). Trials requiring testimony from witnesses residing in and transmission of evidentiary records from distant jurisdictions may prove as inconvenient to the court as to the parties and witnesses. Coordination of long distance litigation may impair a trial court's judicial efficiency. The independent authority of a trial court to consider and promote judicial economy should not be minimized, especially where an alternative forum would serve the interests of justice at lesser expenses of time and money. *See* Niemeyer and Richards, *supra* at 165.

If the parties fail to recognize the need for a transfer based on convenience, the trial court should not be prohibited from considering it on its own initiative.[8] This particularly holds

---

the same meeting at which an amendment to section (c) was proposed. *See* Minutes of the Rules Committee, 18–19 May 1990, at 16–18.

**8.** We recognize that all of the Maryland Rules are not subject to the interpretation we set forth today. In some instances, the Committee has made clear that trial courts do not have the authority to act *sua sponte*. For example, recently the Court of Appeals held that a trial court may not grant a motion for summary judgment entirely on its own initiative. *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc., et al.*, 335 Md. 135, 145, 642 A.2d 219 (1994). In *Hartford Insurance*, the Court analyzed section (a) of Maryland Rule 2–501 which states, in pertinent part, that "[a]ny party may file at any time a motion for summary judgment...." *Id.* at 145, 642 A.2d 219. Searching for interpretational guidance, the Court cited a Committee-authored explanatory note which unequivocally established that the Committee did not intend for trial courts to raise motions for summary judgment on their own initiative. *Id.* The note pronounced that "[s]ection (a) sets forth the standard for the granting of a motion for summary judgment

true where, as in the case *sub judice*, the parties are afforded the opportunity to present their respective positions prior to the court's independent determination. Therefore, based on our interpretation of Rule 2–327(c), we hold that the court did not abuse its discretion by acting on its own initiative in considering appellees' transfer request on the grounds of *forum non conveniens*.

## C.

Having established that the hearing court possessed the inherent authority to transfer the action on its own initiative, we now turn to whether its ultimate decision to transfer was correct. A trial court's decision to transfer under Md.Rule 2–327(c) is reviewable under an abuse of discretion standard. *Lennox v. Mull,* 89 Md.App. 555, 560, 598 A.2d 847 (1991).

In *Odenton Development v. Lamy,* the Court of Appeals considered whether a court's transfer under Rule 2–327(c) was appropriate. *Odenton Development,* 320 Md. at 39, 575 A.2d 1235. The Court adopted the balancing test engaged in by federal courts under section 1404(a). *Id.* at 40, 575 A.2d 1235. A trial court must balance the convenience of the parties and witnesses, as well as the public interest factors of "systemic integrity and fairness," [9] to determine if a transfer is in the interests of justice. *Id.* In addition to those recognized in *Odenton Development,* we adopt from the feder-

---

and makes it clear that a motion is in fact necessary. Consequently, a court may not grant summary judgment upon its own initiative." *Id.* at 146, 642 A.2d 219. Thus, *Hartford Insurance* is distinguishable from the instant case.

**9.** In *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), the Supreme Court set forth the balancing test upon which we now rely to determine the appropriateness of transfer. The public interest factors considered by the Court included, *inter alia,* the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Gilbert,* 330 U.S. at 509, 67 S.Ct. at 843.

al courts the additional factor of proper regard for the plaintiff's choice of forum. *See* Niemeyer and Richards, *supra* at 165 (recognizing that "due consideration must also be given to plaintiff's choice of forum, and this selection will not be altered solely because it is more convenient for the moving party to be in another forum); *see also Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255, 102 S.Ct. 252, 265–66, 70 L.Ed.2d 419 (1981) ("[T]here is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum."); *Clisham Management,* 792 F.Supp. at 157 ("In considering a transfer . . . pursuant to 28 U.S.C. § 1404(a), . . . the plaintiff's choice of forum is entitled to considerable weight.").

▬ It is the moving party who bears the burden of proving that the interest of justice would be served best by transferring the action.[10] *Odenton Development,* 320 Md. at 40, 575 A.2d 1235. Moreover, the court should not grant the transfer unless the balance weighs *strongly* in favor of it. *Id.* With these principles in mind, we turn to the instant case for an evaluation of the court's decision to transfer.

▬ Appellees failed to prove how an action in Prince George's County would inconvenience them or any potential witnesses. The collective evidence offered by appellees in support of the transfer to Montgomery County was limited to affidavit statements reflecting the respective residencies of the individual appellants and the office locations of appellant MCA.[11] Furthermore, although appellees argued that the

---

**10.** We recognize that we have held that the court, on its own initiative, essentially made the motion based on Rule 2–327. For the purposes of our evaluation of the court's ultimate decision in this regard, however, we rely on the arguments of the parties, including those mistakenly advanced by appellees' counsel under § 6–201, to establish the validity, or lack thereof, of the court's decision.

**11.** In support of their position, appellees also argued that telephone conversations between Mr. Simmons and Ms. Siegler, and Dr. Cheetham involved Montgomery County. What they apparently neglect to

cause of action arose in Montgomery County, they never argued that it would be necessary to visit the catheterization site during trial. Likewise, they never alleged that the transferral of any relevant medical records from Montgomery County to Prince George's County would inconvenience them or the court. Finally, they failed to prove how an action in Prince George's County would burden any potential witnesses.[12]

Moreover, we note that Rule 2–327(c) was not designed to serve as a tactic enabling a defendant to forum shop to the detriment of a plaintiff's choice of venue. This is particularly true where, as in the instant case, the venue to which appellees sought a transfer was in close proximity to the one chosen by appellants.

Appellees failed to demonstrate that the need for transfer weighed heavily in their favor as required by *Odenton Development.* In addition, it appears from the hearing record that both appellees' counsel and the court failed to distinguish between "contacts", a term customarily associated with jurisdictional inquiries, and convenience, the appropriate inquiry for a transfer based on Rule 2–327(c). Accordingly, we hold that the Circuit Court for Prince George's County abused its discretion in transferring the action.

## II.

For the guidance of the court overseeing a potential re-trial, we shall comment briefly on the second issue raised by appellants. Although we cannot know, of course, whether the evidence at the new trial will mirror the evidence at the Montgomery County trial, we deem it advisable to draw some attention to this issue so that, should it present itself again,

---

acknowledge, however, is that Mr. Simmons, in fact, called those Montgomery County offices from his residence in Prince George's County.

12. Indeed, the witnesses residing in Prince George's County who testified at the actual trial outnumbered the witnesses residing in Montgomery County.

thoughtful consideration may avoid a problem we note on this record. Appellants assert that the trial court committed reversible error by failing to instruct the jury concerning the doctrine of "last clear chance." [13]

The last clear chance doctrine "presupposes a perilous situation created or existing through both a defendant's negligence and plaintiff's contributory negligence and assumes that there was a time after such negligence has occurred when the defendant could, and the plaintiff could not, by the use of the means available, avert the accident." *Johnson v. Dortch,* 27 Md.App. 605, 614, 342 A.2d 326, *cert. denied,* 276 Md. 745 (1975) (examining last clear chance doctrine in a boulevard law case). In the context of medical malpractice, a physician's act of primary negligence may not be used again to serve as the last clear chance of avoiding injuries. *Myers v. Alessi,* 80 Md.App. 124, 135, 560 A.2d 59, *cert. denied,* 317 Md. 640, 566 A.2d 101 (1989) (patient who failed to make follow-up appointment with physician was not entitled to argue that doctor's original failure to detect cancer was sufficient to establish fresh act of negligence).

The trial court concluded that the requested instruction was not warranted because Mr. Simmons, despite his wife's pleas, refused to go to the hospital following his 12 March conversation with Dr. Urquhart. The court decided that this opportu-

---

**13.** The parties in the case *sub judice* have not concerned themselves with whether the doctrine of last clear chance is applicable to cases involving medical malpractice torts. We recognize that the doctrine is most often discussed in motor torts and the like. Nevertheless, we have identified no organic reason why, under the proper facts, the doctrine of last clear chance would not be applicable in medical malpractice cases. We note that at least one other jurisdiction has evaluated the application of the doctrine in the context of medical malpractice. *Mackey v. Greenview Hospital, Inc.,* 587 S.W.2d 249, 257–59 (Ky.App. 1979) (considering fully but denying application of last clear chance because the physician could not have discovered the danger while there was time to avoid the injury); *see also,* Sharon W. Murphy, *Contributory Negligence in Medical Malpractice: Are the Standards Changing to Reflect Society's Growing Health Care Consumerism?,* 17 U.Dayton L.Rev. 151, 155 (1991) (identifying the application of the last clear chance doctrine as appropriate in the context of medical malpractice).

nity and refusal removed the last clear chance doctrine from the realm of the jury.

The asserted obligation of the court to give the requested instruction required the existence of evidence to support both a fresh act of negligence on the part of Dr. Urquhart and the inability of Mr. Simmons to avert the resulting harm. The trial court's ruling does not indicate that it questioned the viability of appellants' claim that Dr. Urquhart was negligent on more than one instance.[14] Rather, the court took issue with the second requirement under the last clear chance doctrine, namely the plaintiff's inability to avoid the resulting harm. The court assumed that Mr. Simmons could have avoided his own death by seeking medical attention following his discussion with Dr. Urquhart. The court apparently ignored, discounted, or failed to consider the testimony of Mrs. Simmons, relating the effect of Dr. Urquhart's reassurances upon her husband. Mrs. Simmons testified that her husband trusted Dr. Urquhart's diagnosis that his condition was normal to conclude that his life was not in danger.

In general, patients are entitled legally to rely on their physician's advice. *DiLeo v. Nugent*, 88 Md.App. 59, 73, 592 A.2d 1126, *cert. granted*, 325 Md. 18, 599 A.2d 90 (1991), *dismissed*, 16 Sept. 1992 (holding that jury instruction to the same effect was appropriate); *Santoni v. Moodie*, 53 Md.App. 129, 138, 452 A.2d 1223, *rev'd on other grounds*, 292 Md. 582, 441 A.2d 323 (1982).[15] This reliance, however, must be reason-

---

14. Appellants argued that Dr. Urquhart originally negligently failed to respond to Mr. Simmons's messages, despite Ms. Siegler's recitation of symptoms suggesting the existence of a blood clot. Regardless of any interim contributorily negligent failures by Mr. Simmons to seek medical attention, appellants asserted that Dr. Urquhart, when she finally did speak to Mr. Simmons on 12 March, ultimately was negligent in failing to diagnose his fatal condition.

15. In *Moodie v. Santoni*, the Court of Appeals reversed a holding by this court in a related case, *Santoni v. Schaerf*, 48 Md.App. 498, 428 A.2d 94 (1981) (patient's case against the individual prescribing physician employed by the Baltimore City Health Department), affirming the trial court's decision to remove from the jury's consideration the issue of

able or justifiable in order for patients to satisfy their obligations to exercise reasonable care in safeguarding their own health and safety. *See Schaerf,* 48 Md.App. at 511, 428 A.2d 94; *see also Wegad,* 326 Md. at 416, 605 A.2d 123 (relying on *Schaerf* to conclude that, in the context of an accountant's alleged malpractice, "a proper jury instruction should explain that a client's *reasonable* or *justifiable* reliance on his or her accountant satisfies its obligation to exercise reasonable care in safeguarding its interests.").

In *DiLeo v. Nugent,* we set forth when the application of this principle would be appropriate:

> a patient is not in a position to diagnose her own ailments. . . . As a consequence, it is not contributory negligence for a patient to follow a doctor's instructions or rely

---

contributory negligence where a patient took tuberculosis medication as prescribed by a physician employed by the city health plan department. *Moodie,* 292 Md. at 583, 452 A.2d 1223. The Court of Appeals reversed because evidence was presented at trial to. suggest that the patient, although instructed to the contrary, failed repeatedly to notify the Public Health Service that he was experiencing symptoms indicating the existence of hepatitis. *Id.* at 591, 452 A.2d 1223. Accordingly, the Court concluded that the patient's alleged failure to follow the Health Department's instructions entitled the physician and Health Department to a contributory negligence instruction. *Id.*

In a later opinion involving an accountant's malpractice claim, *Wegad v. Howard Street Jewelers,* 326 Md. 409, 605 A.2d 123 (1992), the Court of Appeals commented about the effect of *Moodie v. Santoni* on a patient's entitled reliance on his or her physician's advice. In *Wegad,* the Court stated:

> Making no express comment as to whether Mr. Santoni was entitled to rely on his doctor's advice, this Court looked to Mr. Santoni's failure to act prudently upon other facts he knew or should have known. Thus, the rationale of this Court's decision in *Moodie v. Santoni* is that a patient's failure to otherwise act to protect himself is not in every case justified by his reliance on his doctor's knowledge and skill.

*Wegad,* 326 Md. at 416, 605 A.2d 123. The *Wegad* Court merely reemphasized the sentiment espoused in *Moodie* that patients categorically may not use reliance on their doctors to excuse their own undisputed failures to use reasonable care in relating to their medical providers every symptom indicating the existence of injury. The *Moodie* and *Wegad* decisions do not affect directly our holding in the instant case, therefore, because the parties adamantly dispute whether Mr. Simmons related the important symptoms to Dr. Urquhart.

on the doctor's advice, to fail to consult another doctor when the patient has no reason to believe that the doctor's negligence has caused her injury, or to fail to diagnose her own illness.

*Id.* Moreover, a patient maintains no duty to either question by himself or get a second opinion regarding medical advice given to him by his physician. *Santoni,* 53 Md.App. at 139, 452 A.2d 1223. The relationship "assumes trust and confidence on the part of the patient in the capacity and skill of the physician." *Id., quoting, Halverson v. Zimmerman,* 60 N.D. 113, 232 N.W. 754, 759 (1930).

Mrs. Simmons's testimony, if believed, established that Mr. Simmons did not comprehend that his condition left him in a state of imminent peril. Had the jury been given the last clear chance instruction or some other instruction that fairly covered appellants' evidentiary theory of its case, it could have concluded, based on Mrs. Simmons's testimony, that Mr. Simmons had no cause to believe, and, indeed, was under no duty to foresee, that Dr. Urquhart would fail to diagnose his condition. The jury could have concluded further that this lack of foreseeability of harm left Mr. Simmons powerless to judge whether Dr. Urquhart's advice was in his best interest. In essence, appellants' version of the 12 March 1987 conversation may have entitled them to argue that Mr. Simmons's trust in the skill of Dr. Urquhart left him ignorant of and unable to avert the resulting harm.

While we do not decide whether it was error for the court, on this record, to have refused to have given the requested instruction, we note that the trial court's reasoning for its refusal was inappropriate. The court implicitly rejected appellants' testimonial evidence regarding the 12 March telephone call and, instead, credited appellees' testimony concerning the content of the call. This is not the proper standard by which the court should have decided whether the requested instruction by appellants was appropriate. Given the conflicting testimony, the court should not have resolved

whose evidence it found more credible as part of its decision whether to give the requested instruction.

Ordinarily, a litigant is entitled to have a requested instruction given if the theory it seeks to have presented to the jury is a correct exposition of the law, that law is applicable in view of the evidence before the jury, and the substance of the requested instruction is not covered by the instructions actually given. *Holman v. Kelly Catering, Inc.*, 334 Md. 480, 495–96, 639 A.2d 701 (1994); *Wegad*, 326 Md. at 414, 605 A.2d 123; *but see Dover Elevator Co. v. Swann*, 334 Md. 231, 256–62, 638 A.2d 762 (1994). Although the decision whether a last clear chance instruction will be appropriate upon retrial will necessarily be deferred, it is worth noting that such an instruction as was requested in the Montgomery County trial may not be the only way to instruct the jury properly based on appellants' evidence and their theory of the case. The doctrine of last clear chance, as applied in tort law, aims at resolving the issue of proximate cause. That context may leave the trial court with more than one way in which to address the issues presented by appellants' version of the facts.

If at any new trial appellees' evidence supports and they request an instruction on either contributory or concurrent negligence on the part of Mr. Simmons, the trial court may need to instruct the jury, in the context of determining whose negligence led to Mr. Simmons's death, to decide whose version of the telephone conversation it believed. If the jury were to believe Dr. Urquhart's version, it would be entitled to conclude that Mr. Simmons's negligent failure to seek immediate medical attention following the conversation was the proximate cause of his death and that any previous negligence on the part of Dr. Urquhart in failing to respond to his calls was not the cause. If, however, the jury chose to believe Mrs. Simmons's version, it would be entitled to conclude that Mr. Simmons's reliance on Dr. Urquhart's reassurances was warranted. Under those circumstances, Dr. Urquhart's negligent failure to diagnose and warn Mr. Simmons would constitute the proximate cause of Mr. Simmons's death. Under this

scenario, no last clear chance instruction would be needed or appropriate.

We hasten to say that we do not direct the trial court as to how to instruct in this matter. Rather, we merely intend to provoke careful consideration of the potential instructional scenarios and to observe that the trial court in the case *sub judice* failed to give proper consideration to Mrs. Simmons's testimony when it decided what instructions to give to the jury.

**JUDGMENT REVERSED; CASE REMANDED TO CIRCUIT COURT FOR MONTGOMERY COUNTY WITH DIRECTIONS TO TRANSFER THIS CASE TO THE CIR-CUIT COURT FOR PRINCE GEORGE'S COUNTY FOR A NEW TRIAL; COSTS TO BE PAID BY APPELLEES.**